The next case will be 051495 CACI International v. Department of Defense. Secretary of Defense, Mr. Kilcullen. Good morning, Your Honors. Peter Kilcullen for Colin CACI. I have with me my co-counsel, Mr. Cyrus Phillips, and my wife is in the green jacket sitting in the back. The argument today consists of two parts. Each argument flung from the two breaches of contract that were found by the Board. Although the Board found that, one, the government had failed to realize the single-phase-to-end restraint, which was one breach, and, two, the government failed to meet the implementation plan, the Board decided, erroneously intend, that no damages flow from either breach. I want to make clear that the issue of breach is one that is uncontested. The government has not filed a false appeal, and so for purposes of this case, there is clearly established a breach of the contract. Let's look at the first breach and the damages that flow from it. The one thing that seems to me most clearly missing is any evidence as to what your client's market share would have been if the government had performed as promised. And my understanding of the BCA decision is that they found that there wasn't any support for the market share evidence that was supplied by your two witnesses. And what's your response to that? My response to that is that, first of all, I believe that they found that the total market share used by our expert of 300,000 vendors was not supported. Rather, the Board found it should be about 150,000. I realize there are other findings there. And secondly, as to market share, the expert based his opinion on market share on the actual market that was enjoyed by my client under the actual circumstances that existed. That is, it had about 2,000 customers of about the 5,000 that actually existed. I thought that was a different system. Am I misunderstanding the 2,000 and the 5,000? It wasn't the van operation? No, Your Honor, it was. In fact, during the actual life of the agreement from 1994 through 1998, CACI and its partner at that time, Geist, enjoyed a share of about 2,000 to 5,000 customers. Did that cover the period from 1996 to 1999? From 1996 onward, CACI had about 1,105 established customers out of the existing. By this time, it was down to about 4,000. Okay, so if the government's right that the only period that they could collect damages was the period that they were qualified as a van from 1996 to 1998, what did the evidence show about their market share during that time period? The actual share of customers they had at that time was 1,105 out of approximately 4,000 vendors or approximately 25% of the actual market. Now, the expert projected that in an expanded market that that would decrease to approximately 13% rather than enjoying 25% of the actual market. So there was the actual evidence that showed what the actual market share was. Of course, no one knows what the potential or projected market share would have been, but nonetheless, given the fact that the actual market share was indeed at least 25% from 1996 forward, the expert eventually projected out that the market share would be 12.8%. Can you show me where that testimony is about the actual market share from 1996 to 1998? To show you where that actual testimony is or in the decision? The actual testimony. Well, if the decision repeated it, that would be interesting. I understood them to say that there wasn't any support, that your witnesses didn't have any support for the actual market share estimate. And what I'm asking you is where do I find that support that you'd say exists? Let me just look at what I'm finding in the decision, Your Honor. You can give it to me. Okay, I believe there was a chart that Mr. Curry had made of various models, and I believe he had talked in that chart about CACI actually having 1105. And I hope that you can track that down. I appreciate that. Let me go back to the first breach that was found, and I think this is one of the key points that was missed by the Board. The Board found there was a breach of the exclusivity provisions. That is, that the vendors doing electronic commerce with the Department of Defense were only to do so using a van. The Board found in its finding 56 that, in fact, that had been breached, and that there were other methods that the Department of Defense was using to carry out electronic commerce with its customers. The Board made no finding, however, about the scope of that breach or its effects. The problem is that they made, you know, they had a hearing, they heard witnesses, they made findings. They basically found that your damages model was unsupportable. They made findings of fact. And the question for us is, was that supported by substantial evidence? Could they permissibly conclude that your damages model was speculative? They could permissibly conclude that, Your Honor, that it was speculative. On the other hand, given the fact that there was a breach and the fact that there were customers lost to this appellant, CACI, in fact, customers who were using other methods, not going through vans, and the fact that the breach caused a loss of market, caused a loss of potential customers, that is the failure to implement the system on time. As the Board found, this caused vendors not to want to use the system because the procurement actions were not there. So you had a whole market not only of actual vendors who were conducting electronic commerce, but you had potential vendors who didn't even want to do so because the system had not been implemented on time, and that was the second breach. And both buying organizations and vendors did not want to use it. There was a loss of a potential pool of vendors. What you seem to be saying is they could properly find that your damages model was speculative, but that they ought to have applied a jury verdict approach to it. I'm saying that the Board itself found that there should have been a pool of at least 125,000 customers. The Board itself concluded that it was 124,265. By 1996, they said it should have been there. They rejected our projection that there was 300,000 based upon the evidence. Yeah, but where does that take us? I mean, if you are agreeing that they could permissibly find that your damages testimony was speculative, where does that lead us? Doesn't that lead us that your argument has to be  Precisely, Your Honor. You didn't ask them to, though, did you? Yes, we did ask them. You asked the Board, did you apply that? We certainly did. You identified the evidence that would support a jury verdict? Well, certainly in our briefing we said that if the Board rejects the expert's analysis, then it should proceed then to a jury verdict. And the Board certainly had enough evidence in its own record of saying, well, there was a market of at least 125,000 CACIs market share, even though we're rejecting what the expert had, there was a market share that it knew about. So we're talking actually Is the request for a jury verdict you're just describing, is that in the record we have? Well, Your Honor, of course it is. I said in our briefing In our briefing to them or to us? To the Board, Your Honor. Well, I'm asking you, where in the record would I find that? In the briefs that were submitted. We don't have it as a site. To the fact that we had requested a jury verdict of the Board? So I have two citations. But certainly, yes, I said the Board, based on its own findings, would have had enough evidence before to have proceeded to a jury verdict. And I believe that the teaching of at least two cases in this The problem with the jury verdict approach, even assuming that you raised it, is that you still have to show that they would not be required to speculate. And they seem to say that because this was a new company that everything about market share would have been speculative. Yes, well, of course, this was not a new company and this whole business Well, new company in the sense of it was an established government contractor, but it wasn't established as someone who dealt with third-party vendors. Well, it was. In fact, Your Honor, that was one of the primary problems because, in fact, going into this, CACI already had a market of 1,230 customers, which is shown in the record of Appendix A-195. It already had established 1,230 trading partners that were already doing electronic commerce under the Army system. It had developed a system for the Army. It had developed an EDI system for the Army. And the board was simply wrong in the fact that CACI was new to this whole thing. It was not. It's totally, that finding is not supported by the substantial evidence and, in fact, is contradicted by the substantial evidence in the record that CACI was, in fact, a new company.  It had built, used, and implemented a system under which it was doing electronic commerce with vendors for the Army at the time and came in when the license agreement was finally issued in 1994, came in as the leading provider of electronic commerce to government vendors. I'm into my rebuttal time. All right. Well, let's hear from the government now. Mr. Kirshner. May it please the court. The board's decision that CACI failed to prove its alleged lost profits is supported by substantial evidence and should, therefore, be affirmed. The board correctly concluded that CACI was not entitled to lost profits. Did they request a jury verdict type decision at the board? No, they did not. In all of their briefs, never in any of their briefs, and never during the hearing transcript, did they ever request a jury verdict. So that's, first, one of the reasons why this court should not listen to these arguments now for why there should be a jury verdict. But, secondly, also, the board pointed out in its decision that CACI had failed to establish causation, and having failed to establish causation, then the board, even if it had been asked for a jury verdict, could not go further and assess a jury verdict. We also pointed out in our brief that the evidence simply was not there from which the board, even if it had been asked for a jury verdict, could assess what the jury verdict amounted to. What's your response on the market share question? They say that in the 96 to 98 period, that they had this market share of $1,100 out of $4,000 or whatever it is. Is that right? No. No, it's not right. That's totally fiction. The page that is cited from the PAT report is a page where the PAT report gives information on the Geist van, and it tells you that the Geist van has a certain number of customers. Now, CACI was supplying the software that could be used by some of the vendors that were customers of the Geist van, but these were not CACI. So we're talking this is the pre-'96 period? Yes. That's what the PAT report is. Well, they're saying what does the evidence show about the 96 to 98 period? They say that you're saying the 1,100 customers was pre-'96? Yes. It's a number in the PAT report, and it's the number of Geist customers. It is not the number of CACI customers. Do you have an appendix reference to that? It's the same reference that plaintiff's counsel gave. That was the reference. No, he didn't give a reference. That's the problem. Excuse me. I think he gave appendix number 195 as being the page in the PAT report where the PAT report gives the information on the number of customers in the Geist van. And as I said, those are those— We're on 195. Can I just check my own brief first because I'm not sure I heard correctly the page number that Mr. Kilcallen stated. Mr. Kilcallen, did you give a page number? It's not the date. It says 195. 195. All right. I'm having trouble deciphering what I'm supposed to be looking at here. All right. If you could just give me one second here. I want to make sure that that is indeed— What is discussed in the PAT report is the Geist van, and the numbers given are the number of customers of the Geist van. And I think that—I see on 195, 1,230 separate trading partners. That's at the bottom of page 195. That's the number? And you're saying that's a Geist number rather than a CACI number? Right. Geist, the way it was set up, Geist was the van, and Geist, those customers were Geist customers. And what CACI did is provide software, which was used by some of Geist's customers. Not all of the customers, but some of the customers. So the information prior to 1996 is about what customers Geist had. Of course, one has trouble deciphering that from page 195. I don't know. Well, the information, for example, on 196, it goes on and explains that the cost of SACON's EDI for the vendor on Geist. So it identifies specifically that the vendor is Geist. And that's on 196, which I think would clarify it. Not much. Now, you asked further about is there any basis for the market share. There is not any factual basis for the market share assumptions either before 1996 or after 1996. The evidence that CACI put on at trial was the testimony of its expert, Dr. Kalos. And Dr. Kalos said that he was using a 27.6 market share for the period prior to 1996, up until CACI became a ban in August of 1996. For all that prior period, he was using a market share of 27%. And there was not any factual basis for that. That was just his assumption. It worked out mathematically because he was assuming that vendors would come onto the market and that Geist would have 63,000 customers through the period up through August, finally reaching 63,000 customers in August of 1996. And that then at that point, half of those customers would go to CACI and half would stay with Geist. But that was another unsupported assumption. There was no basis for even – there was not even any factual proof of how many customers Geist had in August of 1996. So these were all assumptions put forth by Dr. Kalos. Now, the other point that CACI is trying to make is saying that it has this extensive market, but CACI actually was providing software. And so the data on CACI deals with its production of its customers for its software. Then the other point I wanted to bring out is that there is not a factual basis for the assertion that's being made that there were only 4,000 customers in the system in October of 1996. What the data actually shows is that in October of 1996, there were 4,000 vendors registered in the contract – in the central contract registry, the CCR. But that is not the same thing as the number of vendors using electronic data interchange. And this was brought out in a testimony at trial by Mr. – by CACI's counsel's cross-examination of Mr. Shattuck. And he testified in appendix pages 1, 4, 3, 9, 1, 5, 4, 5 to 4, 6, that the number of vendors in the CCR was not the number of vendors that were actually conducting electronic commerce through the vans. It was just simply the number that had been included in the registry. So the Board was – properly concluded that there was not a factual basis for the market shares that were being used by CACI's expert. The Board also concluded that lost profits were not appropriate in this type of case where the breach consisted of failing to meet the implementation plan by not deploying 21 contract sites and by failing to meet the single-phase-to-industry approach. Those are the only two breaches found by the Board. There's no breach found that the government breached the exclusivity provision of the contract. The Board did not make that finding. The Board looked to this Court's decision and applied companies and concluded that where the breaches of this nature and of this type of contract, lost profits, there's no entitlement to lost profits. And this was so. I had a hard time understanding that ground. I really did. I mean, this contract contemplated that they would deal with third parties. They'd make their profits from third parties. If they'd come up with adequate proof of lost profits, I don't understand how the government can argue that they're not recoverable as a matter of law because they're from a third-party deal. That just, to me, doesn't make a lot of sense. The reason they're not recoverable has to do with the nature of the breach found by the Board. The Board found that the PAC report schedules were estimates. And because what was here was an inaccurate estimate, that there was no entitlement to lost profits. Well, that's a different question. But I think you convinced the Board of Contract Appeals that as a matter of law, as an alternative ground, as a matter of law, because the profits were to be made by dealing with third parties, that they weren't recoverable. That doesn't make any sense to me. But it's just an alternative ground. You have a better argument about the speculative nature of the shelling. That is an alternative ground. And to address that alternative ground directly, I think what the Board is pointing out there is that in these type of cases, it's just simply too speculative. I think there he's making essentially a factual finding that these type of cases, it's just too speculative to prove lost profits. Where he's ruling as a matter of law is where he follows applied companies. And he says the breach year is analogous to a negligent estimate as in applied companies. And in that case, there was no entitlement to lost profits as a matter of law. So here also he's making the analogy because with the breaches here, it was a failure to meet estimates. It's not a negligent estimate. The question is they lost customers as a result of the breaches. And the question is did they make a showing as to how much they would have lost. It has nothing to do with applied companies. They didn't even make a showing that they lost customers. Well, that's a different problem. Excuse me? That's a different problem. I agree that that is a different problem in their proof. But here the analogy to applied companies is because that as set forth in the factual findings, the PAT report was solely an estimate. And also that there was no guarantee. The contract told them that there was no guarantee of a minimum level of transactions. And because there was no guarantee of a minimum level of transactions, you couldn't put the government in the position of then guaranteeing that there would, in fact, be transactions because the contract told you that there was no guarantee. Now, and then also importantly, the breach was solely of an accurate estimate in the PAT report. That's just not true. That's not the nature of the breach. It's not an accurate estimate in the PAT report. It's that the government didn't perform its obligations under the contract. I mean, I don't understand. It's sort of a shell game. You change the nature of the breach and say that they can't recover from it. That's not a breach of the representations in the PAT report. That is precisely the board's finding. The board found that the van licensing agreement referred to a Department of Defense department-wide plan and that the plan was in Volume 2 of the PAT report and that all the PAT report provided were estimates and that this is in Factual Findings 14, Factual Finding 20, and 26, where the board points out that those schedules are simply estimates. And what the government failed to do here was meet an estimate, and that was the breach. And it also pointed out that in the contract there was no guarantee of the level of transactions. Because there was no guarantee of the level of transactions, you couldn't put the government into the position of guaranteeing a certain level of transactions. Therefore, it was appropriate for the board to make this analogy to applied companies and conclude that because of the nature of the breach, the company was not entitled to lost profits. This is also an alternative holding made by the board. The board also found that there was not a sufficient factual basis for determining reasonable certainty of the profits, determining causation and foreseeability. Thank you. Mr. O'Connell. The two references requested by the court. First, at A-20, which is Finding 55, the board said in August 1997, CACI had only 1,169 customers for its VAN transcript 3-17-18. It was in the board's decision as to the actual number of customers that CACI had. As to the existing amount of customers using the entire system, that's at Appendix A-606, where it says DOD reported in October 1996 that only about 4,000 of an estimated 300,000 government contractors had validated registrations in the database, which was the central contract registry, which is what defenders were supposed to use in order to conduct electronic business. So we have 1,169 of 400,000, or approximately a 25% market share. As to the question about third-party profits, in fact, the board at A-39 said What about the question that Judge Muir asked you about whether you asked for a jury verdict? Okay, excuse me. And the jury verdict question was answered at the decision at A-35, where the board said, as discussed, we cannot find the government's breach was the proximate cause of the damages sought. We cannot, therefore, attempt a jury verdict, as causation must be shown. And so, of course, we're arguing that causation was a factor. But that doesn't show that you raised the question. Well, the board addressed the question of a jury verdict. Did you raise it? We did in our brief, Your Honor. Where? I would have to supplement the record to add briefs. Normally, briefs are not part of the record before this court. As to the applied companies, at least the board did consider the issue of a jury verdict. That's what I was pointing out here. We did, in fact, raise it in the briefs. I would have to look at the transcript to see if, in my closing argument, I did raise it as well. As to the issue of applied companies, Judge Steik, you had that precisely correct. The issue was the breach of the provisions of the VLA, which then caused a loss of customers. The VLA said nothing about the number of vendors that were going to be using the system. That, in fact, became the measure of a breach, not necessarily the breach itself. And that's what the board confused in using applied companies as a precedent in its decision. It is as if I owned a lawn service company and I said to a kid, you're going to mow lawns, but I'm going to apply fertilizer. I don't tell the kid how many lawns there is, but if I don't apply the fertilizer, he doesn't have the lawns to mow. The breach is in not applying the fertilizer. The breach here was in not building the system, implementing the system, and, therefore, I didn't have the number of lawns to mow that I anticipated or the number of customers in that sense that I anticipated. The fact is that you can recover profits from third parties, which is the teaching of Chainbelt and Neely. Just because the profits were to come from vendors, it was still for the company to perform services, for CACI to perform services. They were to realize profits from the third party. But the board said that was almost per se. That was another error of law at 39 where it said, because these profits have the genesis and projected revenues to be realized from contracts with vendors and not from the VLA, they're too remote and uncertain to be part of the recovery. The board simply erred as a matter of law on that. That is not a reason to deny recovery in this case. Thank you. Thank you. The case is submitted.